POLEN, J.
 

 Appellant, Bienvenido Bassallo, appeals his conviction for aggravated assault with a deadly weapon, raising four issues for our consideration. We write only to address appellant’s argument that the trial court abused its discretion in giving a self-defense instruction that indicated the de
 
 *1207
 
 fense applied only if the victim suffered an “injury,” when no injury occurred, which negated the theory of the defense. We reverse and remand for a new trial on this issue alone.
 

 Appellant, a foreman at Arrow Directional Boring, was charged with aggravated assault with a deadly weapon, following an altercation with another foreman, Curt Curtis, at the company yard. The dispute arose over some equipment that appellant borrowed without Curtis’s permission. When Curtis confronted appellant he responded, “F[ — ] you, you’re a piece of s[ — ].” The men exchanged words, and Curtis got in his truck to leave. Appellant followed him, and pulled on the open window, so Curtis could not roll it up. Appellant screamed, “get out of the truck, I’m going to beat your ass, get out of the truck.” When Curtis got out, he saw that appellant had a knife in his hand. Appellant lunged at Curtis and swung the knife around. At this point, two of Curtis’s crew members, David Stokes and Ralph Krites stepped in. Curtis ran around to the back of the truck. He testified: “The door was still open, and I got back in my truck while he’s chasing me around with the knife and lunging to the guys who’s grabbing him, telling them no. And they are trying to push him back and he’s trying to stab me.” The blade was four or five inches long. Curtis said he was afraid; he had no weapon. When Curtis got back into the truck, he rolled the windows up and called 911. Appellant beat on the hood of the truck with the butt of the knife, denting the hood. Curtis backed up and blocked the entrance to the gate. Appellant went inside the shop, and the police arrived shortly thereafter.
 

 Police found a knife inside the shop, which Curtis identified as the one appellant used. At trial, Curtis identified photos of the knife, as well as the knife itself. Curtis demonstrated how appellant held, and swung the knife. Curtis said the knife cut through his shirt, though he never gave the shirt to police. He claimed he did not realize it was cut until he got home.
 

 Curtis acknowledged he was a “big guy,” but said he did not attack appellant because appellant was waving a knife around, and Curtis wanted to get away from him.
 

 Four of Curtis’s crew members — David Stokes, Rodolpho Briones, Daniel Briones-Rodriguez, and Ralph Krites — witnessed the altercation, and all saw appellant with a knife in his hand, trying to get to Curtis. Appellant was in a rage, “very angry, very out of control.” He looked like he was going to hit Curtis. Stokes and Krites tried to calm appellant down, but he kept saying “No, don’t hold me, don’t hold me back.” When Curtis was at the rear of the truck, Briones saw him grab a “stick” — a 2x4 — though he never approached appellant with it. Briones grabbed a shovel. He did not “brandish” it to appellant, but grabbed it just in case appellant cut somebody. After the altercation, appellant went inside the shop. The police arrived shortly thereafter. Briones saw the knife again after an officer found it. He had worked with appellant before, and said that appellant always had that blade with him — either in his pocket or in his car.
 

 On cross-examination, Briones testified that he and his brother worked for appellant’s crew, until appellant fired his brother. Briones and his brother were then transferred to Curtis’s crew. The brothers said they were not testifying because they were mad at appellant or because they feared losing their jobs. It had been a long time, and they were able to work for another crew within the company.
 

 Krites testified that, when appellant lunged at Curtis with the knife, Curtis ran behind the truck and appellant chased him.
 
 *1208
 
 Krites got between the men, grabbed appellant and pushed him backwards. Curtis then got in his truck, backed up to block appellant from leaving, and called the police. Appellant banged on the hood of the truck with the knife, told Curtis to get out and called him names. Appellant then went inside the shop.
 

 Krites identified photos of the cabinet inside the shop where the knife was found. He said the cabinet was used to store chemicals, and he had never seen a knife in there. The officer showed Krites the knife after she found it, and Krites identified it as that used by appellant to threaten the victim.
 

 On cross-examination, Krites testified that he had been transferred from appellant’s crew to Curtis’s crew just a few weeks before the incident. Appellant had tried to get Krites fired. Krites was upset about this, but “was kind of happy that [he] got off his crew.” He had only worked for appellant for about two weeks.
 

 Officer Byrne responded to the scene after receiving a call that a male was threatening other subjects with a knife. Byrne found appellant in the warehouse and patted him down. He had a soap stone device in one of his pockets. Byrne Mirandized appellant and he gave a statement. He admitted to having an altercation with the victim, but denied having a knife in his possession or using a knife to threaten anybody. After appellant was detained, Byrne searched the warehouse for the weapon. She recovered a folding knife inside a cabinet. The victim identified the knife. Officer Byrne also looked at the victim’s vehicle, and noticed a dent on the hood.
 

 Crime scene technician Matz examined the knife found on the scene. The blade was approximately three inches long. No fingerprints were recovered. Matz testified that the handle was rough, and not the type of surface to which fingerprints normally adhere. She also testified that it is “fairly easy” to wipe away fingerprints, with the hands or a cloth, etc.
 

 The defense called Dayne Innis, one of appellant’s former crew members. Innis was working the fusion machine that evening, when he saw Curtis get out of a truck, and begin arguing with appellant. Innis looked away for a few minutes, to concentrate on what he was doing. When he looked back up, he saw Curtis pull a 2x4 piece of wood out of the bed of the truck. Curtis held the wood as if to threaten appellant, and was within striking range. David Stokes stepped in and attempted to lead appellant away. Innis continued working, and the police arrived a few minutes later. Innis never saw appellant with a knife, but he could not say for sure, because the truck was blocking his view. On cross-examination, he admitted he was about 100 feet away, and that he was not watching the altercation the entire time.
 

 Kevin Washington, also a member of appellant’s crew, was working with a machine when he saw Curtis pull into the yard, get out of a truck, and start screaming at appellant. The men argued as Curtis turned and walked back to his truck; appellant followed him. Washington turned away at this point, and went back to what he was doing. He heard someone say “whoa, whoa, whoa, guys, you need to stop.” When Washington looked up he saw Curtis pull a piece of wood out of the bed of the truck, about three or four feet long. Curtis approached appellant with the stick, like he was ready to fight. Appellant had his fists clenched. At this point, David Stokes got between the men to keep them from fighting. Curtis used his cell phone to call the police. Washington returned to his work, and a few minutes later, the police arrived. Washington
 
 *1209
 
 never saw appellant with anything in his hand. When questioned by police, Washington denied seeing anything, and said he did not want to get involved.
 

 Appellant testified on his own behalf. That day, he radioed one of Curtis’s workers about borrowing some equipment. He did not call Curtis directly, because he knew Curtis, also a foreman, would be busy. Curtis answered the call, however, and said: ‘What the f[ — ] are you calling my employees and why the f[ — ] you don’t call me?” Appellant told Curtis he didn’t “have time for this nonsense right now,” and hung up on him. Appellant said he was just trying to get the job done. Later, when Curtis got back to the yard, he got out of his truck and slammed the door. He walked towards appellant, pointing and yelling at him. Curtis yelled, among other profanities, “Who the f[ — ] you do think you are, you wetback, you son of a bitch.” He then walked into the shop. Appellant was preparing to leave, when Curtis came out of the shop, and “got in [his] face.” Curtis again called appellant a “wetback” and a “mother f[-]er,” and spit in his face. Appellant put his fists up, and said: “You know what, let’s have a fist-fight (demonstrating) and get it over with, have a fist-fight (demonstrating) and get it over with, right here, right here.” Curtis then walked over to his truck. When he saw appellant walking towards him, he grabbed a 2x4 out of the back of the truck. Curtis was heavier and taller than appellant, and appellant had nothing in his hands to defend himself. He stood about ten feet away from appellant. Appellant looked around for a way to escape. He saw Rodolpho Briones with a shovel in his hands. As Curtis and Briones came towards him, appellant pulled a soap stone out of his pocket, which is an object used for marking steel. At this point, David Stokes approached appellant, pushed him away and told him: “You don’t need to do this.” Appellant then went to his truck, and the police arrived. Appellant said he felt threatened when Curtis raised the 2x4 at him. He raised the soap stone in self defense, to “intimidate” Curtis so he would back off.
 

 The lady officer asked appellant where the knife was, and he said he didn’t have one. He gave the officer the soap stone, and she threw it down. The officer read him his Miranda rights and arrested him.
 

 After the defense rested, the State recalled Mr. Curtis to testify. He stated that appellant did not have a soap stone in his hand that day, but a knife. Curtis said he did not have a 2x4 in his hand because, if he had, he “would have beat [appellant] with it.” He admitted to calling appellant a “wetback.”
 

 Appellant argues the trial court abused its discretion in giving a self-defense instruction that indicated the defense applied only if the victim suffered an “injury,” when appellant was charged with aggravated assault and no injury occurred, which negated the theory of the defense. We find fundamental error and reverse.
 

 ‘“Issues pertaining to jury instructions are not preserved for appellate review unless a specific objection has been voiced at trial,’ ..., and absent an objection at trial, can be raised on appeal only if fundamental error occurred.”
 
 Lawrence v. State,
 
 831 So.2d 121, 137 (Fla.2002) (quoting
 
 Overton v. State,
 
 801 So.2d 877, 901 (Fla.2001));
 
 see also State v. Weaver,
 
 957 So.2d 586, 587 (Fla.2007). A fundamental error is one that “ ‘reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.’ ”
 
 Lawrence,
 
 831 So.2d at 137 (quoting
 
 Urbin v. State,
 
 714 So.2d 411, 418 n. 8 (Fla.1998)).
 

 
 *1210
 
 Appellant did not object to the instruction at trial. He requested and received the standard justifiable use of deadly force instruction as well as the justifiable use of non-deadly force instruction to the offense of aggravated assault. Appellant did not object during the charge conference, nor did he object after the instruction was given and prior to the jury retiring to deliberate. Although this issue has not been preserved, we find the error was fundamental.
 

 The standard jury instructions on self-defense-justifiable use of deadly and non-deadly force — provide: “It is a defense to the offense with which (defendant) is charged if the [death of] [injury to] (victim) resulted from the justifiable use of force” (likely) (not likely) to cause death or great bodily harm.” Fla. Std. Jury Instr. (Crim.) 3.6(f), (g). Without objection, the trial court instructed the jury in relevant part: “An issue in this case is whether the defendant acted in self-defense. It is a defense to the offense with which Bienven-ido Bassallo is charged if the
 
 injury
 
 to Curt Curtis resulted from the justifiable use of deadly/non-deadly force.” (emphasis added). The court had suggested using the word “assault” in place of the word “injury,” but changed its mind upon the State’s request.
 

 Appellant argues that the trial court fundamentally erred in giving the standard instruction, which includes the word “injury” when the charge was aggravated assault, and “injury” is not an element of the crime, and where the State presented no evidence of injury to the victim. Appellant further contends that the State compounded the error when it argued during closing that the instruction made no sense because the victim suffered no injury. The State responds that the issue was neither preserved nor was there fundamental error. The State contends that the jury was properly instructed, because “injury” is part of the crime — albeit a psychological injury as opposed to a physical one.
 

 “Standard jury instructions are ‘presumed correct and are preferred over special instructions.’ ”
 
 Peters v. State,
 
 33 So.3d 812, 814 (Fla. 4th DCA 2010) (quoting
 
 Brown v. State,
 
 11 So.3d 428, 432 (Fla. 2d DCA 2009) (quoting
 
 Stephens v. State,
 
 787 So.2d 747, 755 (Fla.2001))). However, “[u]sing ‘standard jury instructions does not relieve the trial court of its obligation to determine whether the standard instructions accurately and adequately state the law.’ ”
 
 Id.
 
 Should the trial court determine that the instruction is “erroneous or inadequate,” the court may then modify the standard jury instruction as the “trial judge shall determine to be necessary to instruct the jury accurately and sufficiently.”
 
 Peters,
 
 33 So.3d at 814 (quoting Fla. R. Crim. P. 3.985).
 

 “[A] defendant is entitled to have his jury instructed on the law applicable to his theory of defense if there is any evidence presented supporting such a theory, even if the only evidence supporting the defense theory comes from the defendant’s own testimony.”
 
 Evans v. State,
 
 831 So.2d 808, 810 (Fla. 4th DCA 2002) (quoting
 
 Bozeman v. State,
 
 714 So.2d 570, 572 (Fla. 1st DCA 1998)). “In other words, if there is evidence to support the requested instruction, then defendant has a right to have the jury so instructed. The refusal to give an instruction where evidence supports it is legal error.”
 
 Evans,
 
 831 So.2d at 810. Thus, here, the trial court was correct to give an instruction on self-defense, where there was evidence to support the instruction. However, the inclusion of the word “injury” did not accurately and adequately state the law, because appellant was charged with aggravated assault, for which
 
 injury
 
 is not an element. Nor was there any evidence
 
 *1211
 
 of injury to the victim. Appellant’s sole defense was that he brandished a soap stone in self-defense,
 
 [1]
 
 and the court’s instruction effectively negated the defense. “[T]he appellate courts consistently have found fundamental error in those cases where the erroneous instruction negates the defendant’s sole defense to the crime charged.”
 
 Martinez v. State,
 
 933 So.2d 1155, 1166 (Fla. 3d DCA 2006);
 
 see also Davis v. State,
 
 804 So.2d 400, 404 (Fla. 4th DCA 2001) (fundamental error to give inaccurate and misleading instruction negating sole defensive theory).
 

 The State contends that an “injury” may be psychological as well as physical, and that, here, the “injury” would have been the
 
 fear
 
 the victim felt because of the assault. Yet, the State argued the opposite during closing, stating:
 

 Was the defendant justified in using deadly force? Was the defendant justified in using non-deadly force? Well, according to the defendant, he didn’t use any force. It doesn’t make any sense.
 
 The first paragraph that the Judge is going to read you includes the sentence it is a defense to the offense with which [appellant] is charged if the injury to Mr. Curt Curtis resulted from, the justifiable use of non-deadly force.
 

 What injury to Curt Curtis? It doesn’t make any sense. Sure. He was in fear. He was terrified. There was no injury to him. The instruction has no applicability at all in this case.
 

 (Emphasis added). As appellant contends, the State compounded the error when it argued during closing that the instruction made no sense because the victim suffered no injury. Although appellant did not object to the jury instructions, or to this comment by the State during closing, “the instruction given, coupled with the prosecutor’s comments, served to mislead the jury as to the entire theory of defense.”
 
 Pollock v. State,
 
 818 So.2d 654, 657 (Fla. 3d DCA 2002). This amounts to fundamental error.
 
 See id.
 

 Reversed and Remanded for a New Trial.
 

 WARNER and LEVINE, JJ., concur.
 

 [1]
 

 . The trial court questioned whether the soap stone was a deadly weapon, and appellant responded that it was sharp and that the "edge can cut out an eye.” The court concluded the soap stone could be used as a deadly weapon.